UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED

JAN 2 2 2003

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO

LAMAR JOHNSON, )
)
Petitioner, )
)
vs. )          Case No. 4:00CV408CAS/MLM
)
AL LUEBBERS, )
Superintendent, Potosi Correctional )
Center, )
          Respondent. )

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

This matter is before the court on the Petition for Writ of Habeas Corpus filed by Petitioner

Lamar Johnson ("Petitioner") filed pursuant to 28 U.S.C. § 2254. [4] Respondent filed a Response

and a Supplemental Response to Order to Show Cause Why a Writ of Habeas Corpus Should Not

Be Granted. [0, 12] Petitioner filed a Traverse in Opposition. [21] This matter was referred to the

undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1). [9]

### I.
### BACKGROUND

Petitioner was convicted by a jury, in the Circuit Court of the City of St. Louis, of one count

of murder in the first degree, in violation of Mo. Rev. Stat. § 565.020, and one count of armed

criminal action, in violation of Mo. Rev. Stat. § 571.015. Petitioner also was charged as a prior and

persistent offender pursuant to Mo. Rev. Stat. § § 558.016 and 557.036.4. After having found

Petitioner to be a prior offender, the trial court sentenced Petitioner to life imprisonment without

probation or parole for the murder in the first degree. He received a concurrent sentence of life

33

imprisonment for the armed criminal action.

The Missouri Court of Appeals, Eastern District, stated that the record, viewed in a light most favorable to the verdicts, indicates as follows:

> [O]n October 30, 1994, James Elking (Elking), a friend and co-worker of Marcus Boyd (victim), went to his house at 3910 Louisiana in the city of St. Louis to see if he would give Elking a ride to work on Monday morning. As Elking knocked on the front door of victim's house, victim arrived with his girlfriend, Leslie Williams (Williams) and their baby. Victim instructed Elking to wait on the porch as victim, Williams, and the baby went upstairs.

> Victim came back downstairs and he and Elking sat on the top step of the porch and began to talk. Approximately twenty to thirty minutes later, [Petitioner] and Phillip Campbell, two men Elking had never seen before, came from behind the right side of the house and walked up to the porch. [Petitioner] and Phillip Campbell were wearing solid black pullover masks, exposing their faces from the nose to the forehead, and carrying guns. [Petitioner] and Phillip Campbell ascended the steps leading up to the porch and, while Phillip Campbell moved towards victim, [Petitioner] told Elking to "get the f--k up."

> [P]etitioner spun Elking around to face victim and Phillip Campbell and Elking moved to the bottom of the steps leading up to the porch. Victim sat down and Phillip Campbell "got on top" of victim while [Petitioner] stood with one leg on the porch in front of Elking. Phillip Campbell then shot victim in the neck and [Petitioner] went up the steps of the porch and shot victim in his side. [Petitioner] and Phillip Campbell fired their guns at victim between five and six times.

> Williams began screaming as she came down the stairs, at which point Phillip Campbell stood up and fired two shots at victim. Phillip Campbell and [Petitioner] then descended the stairs of the porch, looked at Elking, pointed their guns at him, and fled. ...

> An autopsy revealed that victim had been shot eight separate times in the neck, back, side, and thigh. Seven bullets were recovered from victim's body and it was determined that the wounds to victim's neck and abdomen contributed to his death.

> On November 3, 1994, at about 2:00 p.m., Elking contacted police and met with Detective Joseph Nickerson (Nickerson). Upon being shown five photographs, Elking recognized and identified [Petitioner] as one of the individuals who shot victim.

Later that day, Detective Clyde Bailey (Bailey) and his partner, Detective Gary Stittum, were driving their patrol car north on Grand Avenue and observed [Petitioner] driving south. The officers stopped the car and took [Petitioner] and co-defendant Phillip Campbell into custody.

At about 6:15 p.m. at the police station, Nickerson interviewed [Petitioner] and asked him questions about the shooting of victim, at which point [Petitioner] said, "[M]an, that boy was my friend, I didn't shoot him, I was with my girlfriend on Lafayette when that happened."

Resp. Ex. 9 at 3-5.

Also, that night, Detective Campbell interviewed Petitioner at the police station regarding Petitioner's possible involvement in another case. He did not ask Petitioner about the murder of Boyd. See Resp. Ex. 2 at 228-29. During the course of the interview, Petitioner said, "Why did I let the white guy live?" Id. at 229. When Detective Campbell asked Petitioner what he was talking about, Petitioner said, "Man, there was a witness, why did I let the white guy live?" Id. Detective Campbell again asked Petitioner what he meant, and Petitioner indicated that the victim was his friend and further stated "[W]e're f–d because we let the white guy live." Id.; Resp. Ex. 9 at 5. Later that night, Elking contacted police and met with Detective Joseph Nickerson. Elking attended a live line-up and "initially identified the man in position number four as the man who shot victim. A short time later, however, Elking identified [Petitioner] as the man who shot victim." Resp. Ex. 9 at 4. Also, that night, Elking identified Petitioner from a second live line-up and from photographs. Resp. Ex. 9 at 4.

The Missouri appellate court further stated that:

On November 5, 1994, [Petitioner] and Phillip Campbell were confined separately in holding cells seven and six, respectively, in the St. Louis City Jail Central Holdover. At the same time, William Mock (Mock) was confined to cell ten. While in his cell, Mock heard [Petitioner] participate in a conversation with other

3

prisoners. Mock heard a prisoner named "Lamont" ask another prisoner named "Lamar," "[D]o you think they got enough to hold 'ya?" [Petitioner] answered, "[T]hey don't have the gun, they don't have the white boy, they're not askin' the right questions, they don't have sh--." Mock also heard [Petitioner] instruct the other prisoner to "get a hold of a guy named Terrell and get the gun and take care of the white boy," and that "Terrell" needed to tell [Petitioner's] family that he was "with them at the time of the murder." Mock asked one of the jailers to contact a homicide detective so that Mock could relate what he had heard in his cell.

Detective Ronald Jackson (Jackson) responded to Mock's request, went to his cell, and brought him to the homicide office. Once there, Mock repeated to Jackson the conversation between "Lamont" and [Petitioner]. After Mock spoke with Jackson, he was returned to his cell. Upon returning to his cell, Mock overheard another prisoner nervously telling [Petitioner] that "if they get Terrell and get the gun, they'll know about the robbery we did on the south side," at which point [Petitioner] told the other prisoner to "shut up" or something to that effect. Subsequently, Mock gave a taped statement to the police regarding everything he had heard in his cell.

Resp. Ex. 9 at 6.

As noted by the Missouri appellate court, Petitioner's trial counsel made various motions in limine prior to trial, including an objection to the introduction of a mask seized from the trunk of Petitioner's vehicle during search made prior to the murder "as irrelevant to the case." Resp. Ex. 9 at 8. The trial court overruled this objection. Defense counsel also asked the court that he be permitted to refer to exculpatory statements made by Petitioner to Nickerson in his opening statement. The trial court denied this motion. See Resp. Ex. 9 at 8.

At trial, the State presented the testimony of Elking, David Ury, a police officer and evidence technician, Detective Bailey, Dr. Michael Graham, the medical examiner, Williams, the victim's girlfriend, Detective Campbell, Mock, Steven DeBisschop, a processing clerk for the police department, Detective Jackson, and Detective Nickerson. Petitioner did not testify, but did present the testimony of Barrow, his girlfriend.

4

As stated by the Missouri appellate court, at trial, Elking testified that:

> The masks which [Petitioner] and Campbell wore were solid black and were
> "pullovers," leaving the area from the nose to the forehead open, exposing the eyes.
> He stated that he had never seen [Petitioner] or Phillip Campbell prior to the shooting
> and that, as they entered the porch, Elking focused on [Petitioner], who was staring
> at him and had one eye that was "kind of lazy." He stated that during the course of
> the shooting he had seen [Petitioner] and Phillip Campbell for two or three minutes
> and that he was able to identify [Petitioner] because of his lazy eye, height, and build.
> ... Elking testified that, upon viewing the live line-up, he knowingly identified the
> wrong individual and had thought about "backing out of the whole thing" because he
> was "very nervous at that point." However, a short time later, Elking told Nickerson
> that he had identified the wrong individual because he felt intimidated and scared
> from "the people in the line-up." Elking testified that as he viewed the second line-
> up, he informed Nickerson that [Petitioner] . . . had shot victim. Defense counsel's
> renewed objection that the mask was "horribly prejudicial" and had no probative
> value, was denied by the trial court. Subsequently, Elking was shown the mask and
> testified that he had seen the mask before and that it was the same type of mask worn
> by the two hooded men who shot victim.

Resp. Ex. 9 at 8-9. See also, Resp. Ex. 1 at 156-195.

Elking further testified that the two gunmen interrupted a conversation he was having with

Boyd, and that, as they were interrupted, the gunmen came up the stairs and "went straight for

Marcus. As Marcus was scooting back behind me, I kind of was still sitting on the porch focusing

on the one person that came up to me and told me to get the f - - k up." Id. at 160. When asked if

there was anything unusual about that person's eyes, Boyd testified that the gunman who came up

to him had "one eye [which] was kind of lazy." Id. Boyd said that the gunman with the lazy eye was

staring right at him. He identified Petitioner in the courtroom as that gunman. See id. Elking also

testified that he did not call police for several days after the murder because he was scared and in

shock. See id. at 166. He said when he first got in touch with the police he was shown four or five

photographs at about 2:00 p.m. See id. at 168. Out of these photographs he chose Petitioner. Elking

further testified that he viewed the line-up the same day that he viewed the photographs. Elking also

said that when he first identified the second person in the line-up rather than Petitioner he did not commit to that identification; he "just said that [he] thought it was [the person]." Id. at 169-70. At the time he identified number two, Elking explained that he knew it was not the person. Id. at 170.

Detective Bailey testified that on August 17, 1994, which was prior to the murder of Boyd, Petitioner gave consent to search the trunk of his car, and that, pursuant to the search, he found a mask. At trial, Detective Bailey identified the mask which he found in the trunk of Petitioner's car. See Resp. Ex. 9 at 9; Resp. Ex. 2 at 206. Detective Bailey further testified that on November 3, 1994, while with his partner, Detective Stittum, he saw Petitioner driving north on Grand. Petitioner was with Phillip Campbell at the time. Detective Bailey testified that he then took Petitioner into custody. See id. at 207.

Leslie Warren, Boyd's girlfriend, testified that Boyd was her baby's father and that on the date of the homicide, she was living at 3910 Louisiana with Boyd, his mother, and her mother. She said she was giving the baby a bath when she thought she heard firecrackers, so she put the baby on the floor and ran downstairs. Warren said she saw somebody in all black fire a gun. Warren further testified that Petitioner is her cousin's baby's father, and therefore, she knew him at the time. She said that she had seen Petitioner's eye's a lot and that he has a lazy eye. "[I]t is like the whole side of his face is kind of slanted."

Mock testified regarding what he heard Petitioner say while in his cell as described above by the appellate court. See id. at 246-47. Mock explained that he knew which prisoners were speaking because they were using names. Mock specifically testified that the person named Lamar told Lamont to "get hold of a guy named Terrell and get the gun and take care of the white boy, the white boy must be snitchin." Id. at 247. Mock further testified that the conversation he heard

6

concerned a robbery "involving a white boy" and that Petitioner stated that during the course of the robbery he had "killed the white boy for not giving up his sh--." Resp. Ex. 9 at 9; Resp. Ex. 2 at 245-279. Mock testified that he relayed the conversations which he overheard to Lieutenant Ronald Jackson and that he contacted Jackson through one of the jailers. See id. at 247-48. Mock further said that Jackson took him to a room in the homicide division and handcuffed him to a table while they talked. He further said that at the time he spoke with Jackson nobody had told him anything about the murder of Boyd. See id. at 248. Mock also said that the police or the prosecutor did not promise him anything for his providing information, although he said that he did ask the prosecutor to write a letter to the Board of Parole, which letter the prosecutor wrote. Mock explained that the reason he came forth with the information was that his wife, who was very dear to him, "was the victim of a senseless homicide in which the person had no regard for her life whatsoever" and because he did not "think it's right for people to take lives of other people." Id. at 250.

Jackson testified that Mock gave him information regarding two separate incidents and that "there were no records of a 'robbery killing of a white boy on the south side' that fit the description given by Mock." Resp. Ex. 9 at 9. At the close of the State's evidence, Petitioner made a motion for judgment of acquittal, which the trial court denied.

Petitioner then presented the testimony of Barrow. Barrow testified that she dated Petitioner for two years; that on October 30, 1994, after she got off work she went to her mother's house; that she left her mother's house at about 7 p.m., when Petitioner picked her up; that Petitioner did not come inside the house when he picked her up; that they then went to her home, where she stayed for about an hour; that she, her baby, and Petitioner then went to her friend's house; that at some point Petitioner left the friend's house for less than five minutes; that after Petitioner returned a telephone

7

call was received at the friend's house; and that as a result of the telephone call Barrow learned that Marcus Boyd had been killed. See Resp. Ex. 2 at 311-315. Barrow testified that Petitioner was in her presence on the date of Boyd's murder, October 30, 1994, from 7 p.m. until the time he went to bed, except for the five minutes he left her friend's house. See id. at 315. On cross examination, Barrow also testified that the murder occurred on a Sunday; that Petitioner said he was going to the liquor store to meet someone when he left; that the liquor store was next door to her friend's house; and that Petitioner did not bring back anything upon his return. See id. at 318-22.

Detective Nickerson testified for the State as a rebuttal witness. He said that it takes no more than five minutes to drive from the location of Barrow's friend's residence to the scene of Boyd's murder, although he said it could take longer depending on traffic and stop lights. See id. at 333-35.

At the close of all evidence, Petitioner renewed his motion for acquittal, which motion was denied by the trial court. See id. at 337; Resp. Ex. 4 at 58. On July 12, 1995, the jury found Petitioner guilty of the first degree murder of Boyd and of armed criminal action.

On August 4, 1995, Petitioner filed Motion for Evidentiary Hearing to Determine if Newly Discovered Evidence Necessitates a New Trial and a Motion for New Trial. See Resp. Ex. 4 at 59-65. Petitioner raised numerous issues in his motion for a new trial, including objections to the introduction of the mask; the court's sustaining the State's objection to Nickerson's testimony regarding Petitioner's exculpatory statements; and the court's overruling Petitioner's objections to Elking's testimony because of his equivocations over identifying Petitioner. See id. Petitioner further requested, in his August 4, 1995, motion that the court grant an evidentiary hearing "to determine whether newly discovered evidence is now available to the defense. This evidence would consist of testimony that Phillip Campbell and another, not [Petitioner], committed the murder of

8

Marcus Boyd. The evidence will be produced through the testimony of [Petitioner] and Phillip Campbell." Resp. Ex. 4 at 64.

On September 8, 1995, Petitioner filed a Motion to Compel Handwriting Sample from Phillip Campbell. See Resp. Ex. 4 at 66. Petitioner said that the "sample was needed to prove [Petitioner] received letters from Phillip Campbell helping to prove [Petitioner's] innocence." Id. Petitioner also requested an evidentiary hearing.

Petitioner introduced four letters at his sentencing hearing on September 29, 1995, which letters were allegedly authored by Phillip Campbell, and in which Campbell stated that an individual named "B.A." shot Boyd and that Petitioner did not do so. The letters were allegedly taken from Petitioner's jail cell. Petitioner argued that the jury would have reached a different conclusion had they seen the letters. The State stipulated that the letters were written by Phillip Campbell but argued that Petitioner did not refer to the letters in his motion for a new trial; that the letters were not credible; and that, as the letters were not dated, there was no proof that they were newly discovered. At Petitioner's sentencing hearing, the trial court denied Petitioner's motion for a new trial and, after the parties agreed that Phillip Campbell would not testify.[1] See Resp. Ex. 3 at 1-10; Resp. Ex. 4 at 49.

In one of the letters, Phillip Campbell stated:

What's up dude. That's f- - -d up you got convicted when you didn't do a thing. I tell my lawyer to let me tell the true but he wont. Because he said I could have my [unintelligible]. I'm sorry I got you in to this but me and didn't try and kill Markus it just happen. That white boy ran when I pulled him from the steps. I didn't

---

[1] The trial court asked Petitioner's attorney if he had any indication whether Phillip Campbell would testify as his own case was still pending. See Resp. Ex. 3 at 10. It was represented to the court by the prosecutor and Petitioner's attorney that Phillip Campbell's attorney had said that his client would not testify. See id.

see him anymore after we shot Markus. These people told him to lie on you.

Resp. Ex. 12.

In another one of these letters Campbell stated, in a letter to Petitioner:

> I don't know why you keep telling people we tried to kill Markus. Went up there to pistol whip Markus about talking to Puffy. When we ran out [unintelligible] B.A. tried to grab Markus. They started wrestling for the gun and that's why we had to shoot him I don't know that honkey lied about us having on mask. The only reason why B.A. put one is because [sic] Markus knew he stayed down the street. And he might tell what we would do to him.

Resp. Ex. 12.

Another letter stated:

> I'm going to real with you. I don't really know what I want to do. Because I want to help you if I didn't I would feel bad. I sit and think so I can see where you're coming from. Your right b.a. didn't show us no love. I'm not his side snitching is something I can not do. I'm just saying we were in the game and you know how the game go. B.A. just got lucky and didn't get caught. I know what your facing and if was in your shoes, I'd be scared to but it would something I had to do. The reason [sic] I was tripping is because I thought you gave your p.d. the letter don't do that. That will f - - - things up if I go through with it. I'm not turning by back on you it's just you. Talked some Big Sh- - and I was expecting you to stand on it. Tell me the truth if I didn't help and went to court. Would I be wrong" What would you do in my shoes" Tell me the truth. I don't' want this to break us up. We was in the game we know how the game go. Straight up. You win or lose.

Petitioner filed a Notice of Appeal on October 10, 1995. See Resp. Ex. 4 at 74. On February 7, 1996, Petitioner filed a filed a pro se motion to vacate, set aside, or correct his judgment or sentence, alleging ineffective assistance of counsel. See Resp. Ex. 6 at 3-17. On February 14, 1996, private attorneys entered their appearance on behalf of Petitioner and subsequently, on April 8, 1996, filed an amended motion. See Resp. Ex. 6 at 22-36. The motion court granted Petitioner a hearing on certain of his claims. See Resp. Ex. 6 at 37. On October 25, 1996, Petitioner filed a second motion for a new trial based on newly discovered evidence and prosecutorial misconduct involving

the failure to disclose Mock's prior convictions. See Resp. Ex. 6 at 49. Petitioner also asserted that Phillip Campbell recently provided him with an affidavit stating that he and James Howard caused the death of Markus Boyd;[2] that subsequent to the shooting he saw Petitioner and asked him for a ride; and that it was while Petitioner was giving Campbell a ride that they were pulled over by the police and arrested for the murder of Boyd. Petitioner's second motion for a new trial was denied by Order, dated April 23, 1997. See Resp. Ex. 6 at 49.

In the hearing for his Rule 29.15 motion, Petitioner testified that he told his trial counsel that he wanted to testify at trial but that he followed the advice of his counsel not to testify. Petitioner further testified at the hearing that had he testified at trial he would have said, among other things, that he was at his girlfriend's friend's house with his girlfriend and her daughter at the at the time Boyd was murdered; that he left for about five minutes when he went outside and rode around the block; and that he received two telephone calls from Williams and her cousin, Pamela, who is the mother of Petitioner's baby, while he was at the friend's house; that Pamela told him, during the second call, that Boyd had been shot and that Williams had told the police that Petitioner was responsible. Petitioner further testified that he would have testified that he did not make the statements attributed to him by Detective Campbell regarding leaving a white boy alive and that he did not make the statements attributed to him by Mock. Petitioner also said that he would have testified that Phillip Campbell was in his car at the time of his arrest because he had just driven by a bus stop, saw him, and offered him a ride, and that the mask found in his car belonged to Stanford Morris, not him. Petitioner further testified that he would have testified at trial that Boyd was his best friend.

---

[2]     This "affidavit" is not included in the record before this court.

The State called Petitioner's trial attorney to testify at Petitioner's Rule 29.15 hearing. The trial attorney said that he advised Petitioner not to testify because his "priors" would come out and because the State could link Petitioner and Boyd as business partners. The attorney also said that Petitioner never told him that he was rejecting the advice and wanted to testify. The attorney further testified that he first objected to Mock's testimony regarding Petitioner's admitting to a robbery and the murder of a white boy, but then withdrew it. He said he was trying to show the jury that Mock was not talking about two separate incidents but one, but he conceded that he wished he would have kept this testimony out and cross-examination did not show that Mock was talking about only one incident. The attorney further testified that he did not call Nickerson as a strategy decision because he would have testified that he did not take notes, so his police report might not be accurate concerning when Elking first mentioned the lazy left eye. Petitioner's Amended Rule 29.15 motion was denied on April 23, 1997. See Resp. Ex. 6 at 51-61.

Petitioner filed a consolidated appeal of the judgment against him and of the denial of his Rule 29.15 motion. On appeal, Petitioner alleged: (1) ineffective assistance of trial counsel based on counsel's waiving an objection to Mock's testimony; (2) the trial court erred by not sua sponte ordering a mistrial after Mock testified repeatedly that Petitioner made admissions he committed a different crime; (3) the trial court erred in overruling his objections to the admission of the mask; (4) the trial court erred by sustaining the objection of the State to Nickerson's testifying that Petitioner told him he was not involved in Boyd's murder and that he was with his girlfriend at the time; (5) the trial court erred in denying his motion for a new trial and an evidentiary hearing based on the newly discovered evidence in the form of Phillip Campbell's letters. See Resp. Ex. 7. The Missouri appellate court denied Petitioner's appeal. See Resp. Ex. 9.

Petitioner filed a Petitioner under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody with this court on December 2, 1999. In his Petition, Petitioner sought relief on the following grounds:

**(1)** The trial court erred in admitting as evidence the mask seized from Petitioner's car prior to the murder of which he was convicted.

**(2)** Petitioner was denied effective assistance of counsel because his trial counsel waived an objection to the testimony of witness Mock.

**(3)** The trial court erred by not sua sponte declaring a mistrial because of the testimony of witness Mock.[3]

**(4)** The trial court excluded testimony that Petitioner denied participation in the murder of which he was convicted and testimony that he claimed to be with his girlfriend at the time of the murder.

**(5)** The trial court erred in not granting Petitioner a new trial or an evidentiary hearing on his motion for a new trial which motion was based on newly discovered evidence in the form of letters from Petitioner's co-defendant.

## II.
## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"), applies to all petitions for habeas relief filed by state prisoners after this statute's effective date of April 24, 1996. See Lindh v. Murphy, 521 U.S. 320, 326 (1997). Petitioner's § 2254 petition was received by this court on June 2, 1999, and, therefore, the AEDPA standards apply to his petition for writ of habeas corpus.

In Williams v. Taylor, 529 U.S. 363, 412-13 (2000) (Williams), the United States Supreme Court set forth the requirements for federal courts to grant writs of habeas corpus to state prisoners

---

[3] Petitioner included Grounds 2 and 3, as stated above, as a single basis upon which relief should be granted. In order to adequately addresses the issues presented by Petitioner, the court has designated the issues as two distinct grounds for relief.

under § 2254. The Court held that "§2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application with respect to claims adjudicated on the merits in the state court." Id. at 412. The Court further held that the writ of habeas corpus may issue only if the state-court adjudication resulted in a decision that:

> (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal Law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application"clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. 412-13.

Williams further holds that the writ will not issue merely because the federal court concludes that the relevant state-court decision erroneously or incorrectly applied clearly established federal law. See id. at 411. "Rather the application [by the state-court] must also be unreasonable." Copeland v. Washington, 232 F.3d 969, 973 (8th Cir. 2000), (Copeland), cert. denied, 532 U.S. 1024 (2001). See also, Siers v. Weber, 259 F.3d 969, 973 (8th Cir. 2001), cert. denied, __ U.S. __, 122 S.Ct. 1087 (2002).

The Court further explained in Williams that for a state-court decision to satisfy the "contrary to" prong of § 2254(d)(1), the state court must apply a rule that "contradicts the governing law as set forth in [Supreme Court] cases" or if it "confronts a set of facts that are  materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent." Id. at 407. For a state-court decision to satisfy the "unreasonable

application of" prong of § 2254(d)(1), the state court decision must "identif[y] the correct governing legal rule from [Supreme Court] cases but unreasonably appl[y] it to the facts of the particular state prisoner's case" or "unreasonably [extend] a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably [refuse] to extend that principle to a new context where it should apply." Id. The Eighth Circuit has held that "[t]o the extent that 'inferior' federal courts [including the Eighth Circuit] have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness of the state court's resolution of the disputed issue." Atley v. Ault, 191 F.3d 865, 871(8th Cir. 1999).

Additionally, § 2254(d)(2) provides that an application for writ of habeas corpus should not be granted unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." Further, pursuant to § 2254(e)(1), "[a] state court's determination on the merits of a factual issue is entitled to a presumption of correctness." Boyd v. Minnesota, 274 F.3d 497, 500 (8th Cir. 2001) (Boyd). The state court's decision "must be rebutted by clear and convincing evidence." King v. Kemna, 266 F.3d 816, 822 (8th Cir. 2001) (King), cert. denied, __ U.S. __, 122 S.Ct. 1311 (2002).

## III.
## EXHAUSTION ANALYSIS

To preserve issues for federal habeas review, a state prisoner must fairly present his or her claims to state courts during direct appeal or in post-conviction proceedings. See Sweet v. Delo, 125 F.3d 1144, 1149 (8th Cir. 1997) (Sweet). Failure to raise a claim in a post-conviction appeal is an abandonment of a claim. See id. at 1150 (citing Reese v. Delo, 94 F.3d 1177, 1181 (8th Cir.

1996)). A state prisoner who fails "'to follow applicable state procedural rules [for] raising claims' (citation omitted) . . . , is procedurally barred from raising them in a federal habeas action, regardless of whether he has exhausted his state-court remedies." Id. at 1151 (citing Coleman v. Thompson, 501 U.S. 722, 731-32 (1991) (Coleman)). "[A] prisoner must 'fairly present' not only the facts, but also the substance of his federal habeas claim." Agdullah v. Groose, 75 F.3d 408, 411 (8th Cir. 1996) (en banc) (citation omitted). "[F]airly present" means that state prisoners are "'required to refer to specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue.'" Id. at 411-12. A state-law claim which is raised in state court which "is merely similar to the federal habeas claim is insufficient to satisfy the fairly presented requirement." Id.

A state prisoner can overcome procedural default if he or she can demonstrate cause for the default and actual prejudice or demonstrate that default will result in a fundamental miscarriage-of-justice. See Coleman, 501 U.S. at 750-51. "A habeas petitioner who wishes to have a procedurally defaulted claim [considered] on its merits now 'must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner [guilty] under the applicable state law.'" McCoy v. Lockhart, 969 F.2d 649, 650 (8th Cir. 1992 ) (citing Sawyer v. Whitley, 505 U.S. 333 (1992)). Actual innocence is required to meet the miscarriage-of-justice exception to the procedural requirements described above. See Sweet, 125 F.3d at 1152 (citing Schlep v. Delo, 513 U.S. 298, 316 (1995)). Indeed, a "'bare, conclusory assertion' that a petitioner is actually innocent is insufficient to excuse a procedural default." Id. (citing Weeks v. Bowersox, 119 F.3d 1342, 1352-55 (8th Cir. 1997)).

Prior to considering the merits of a state petitioner's habeas claim, a federal court must

16

determine whether the federal constitutional dimensions of the petitioner's claims were fairly presented to the state court. See Smittie v. Lockhart, 843 F.2d 295, 296 (8th Cir. 1988) (Smittie). "If not, the federal court must determine if the exhaustion requirement has nonetheless been met because there are 'no currently available, non-futile remedies,' through which the petitioner can present his claim." Id. (citation omitted). In O'Sullivan v. Boerckel, 526 U.S. 838 (1999), the United States Supreme Court determined that to satisfy the exhaustion requirement of 28 U.S.C.§ 2254(b)(1), a state prisoner must present his or her claims to a state's supreme court, even where review by that supreme court is discretionary and not mandatory. The Eighth Circuit has held that the exhaustion doctrine, as stated in O'Sullivan, should not be applied in pre-O'Sullivan cases, stating, "we conclude that justice dictates a different outcome . . . because the State has not consistently asserted the failure to seek a discretionary transfer is a bar to federal habeas relief." Dixon v. Dormire, 263 F.3d 774, 781 (8th Cir. 2001) (Dixon). See also Randolph v. Kemna, 276 F.3d 401, 403 (8th Cir. 2002) (Randolph); Clark v. Caspari, 274 F.3d 507, 510 (8th Cir. 2001) (Clark) (citing Ford v. Georgia, 498 U.S. 411, 423-24 (1991) ("[O]nly a 'firmly established and regularly followed state practice' will bar federal court review.")).

In Randolph, 276 F.3d at 404, the Eighth Circuit held that "the Missouri Supreme Court has recently shed light on its requirements for exhaustion of state remedies." The court further noted that an amended Missouri Supreme Court Rule 83.04 "'reflects the principle that transfer from the court of appeals to [the Missouri Supreme] Court is an extraordinary remedy that is not part of the standard review process for purposes of federal habeas corpus review.'" Id. By amending Rule 83.04, "the Missouri Supreme Court has made it clear that the law of Missouri" does not require "prisoners to pursue discretionary review by petitioning for transfer to the Missouri Supreme Court." Id. The

Eighth Circuit concluded, in Randolph, that a state prisoner, seeking federal habeas review, need not

seek transfer to the Missouri Supreme Court. See id. at 405.

In Duncan v Walker, 533 U.S. 167, 178-79 (2001) (Duncan), the United States Supreme

Court held that "[t]he exhaustion requirement of § 2254(b) ensures that the state courts have the

opportunity to fully consider federal-law challenges to state custodial judgment before the lower

federal courts may entertain a collateral attack upon that judgment." See e.g., O'Sullivan v. Boerckel,

526 U.S. 838, 845 (1999) (O'Sullivan ); Rose v. Lundy, 455 U.S. 509, 518-19 (1982) (Rose). The

Court further stated that "[t]his requirement 'is principally designed to protect the state courts' role

in the enforcement of federal law and prevent disruption of state judicial proceedings.'" Duncan,

533 U.S. at 179 (citing Rose, 455 U.S. at 518). "The exhaustion rule promotes comity in that 'it

would be unseemly in our dual system of government for a federal district court to upset a state court

conviction without an opportunity to the state courts to correct a constitutional violation.' " Id.

(quoting Rose, 455 U.S. at 518) (quoting Darr v. Burford, 339 U.S. 200, 204 (1950)). As stated by

the Court in O'Sullivan, 526 U.S. at 844, "[c]omity thus dictates that when a prisoner alleges that

his continued confinement for a state court conviction violates federal law, the state courts should

have the first opportunity to review this claim and provide any necessary relief."

Additionally, § 2244(d)(1) establishes a 1-year limitation period on petitions filed pursuant

to § 2254. The Court, in Duncan, recognized the need to reconcile the tolling provision of §

2244(d)(2) with the exhaustion requirement of § 2254(b). The Court held that:

> Section 2254(d)(2) promotes the exhaustion of state remedies by protecting a state
> prisoner's ability later to apply for federal habeas relief while state remedies are
> being pursued. At the same time, the provision limits the harm to the interest in
> finality by according tolling effect only to "properly filed application[s] for State
> post-conviction or other collateral review."

18

Duncan, 533 U.S. at 179-80.

The Court in Duncan further acknowledged that the exhaustion requirement is designed to reduce the risk of piecemeal litigation. See id. at 180. Thus, "'strict enforcement of the exhaustion requirement will encourage habeas petitioners to exhaust all of their claims in state court and to present the federal court with a single habeas petition.'" Id. (quoting Rose, 455 U.S. at 520).

Indeed, under Missouri law, "relief available under a writ of habeas corpus has traditionally been very limited, and courts are not required to issue this extraordinary writ where other remedies are adequate and available." Covey v. Moore, 72 S.W.3d 204, 210 (Mo. App. 2002) (Covey) (quoting Clay v. Dormire, 37 S.W.3d 214, 217 (Mo. 2000) (en banc) (Clay). In Brown v. State, 66 S.W.3d 721, 726 (Mo. 2002) (en banc) (Brown), the Missouri Supreme Court adopted the "cause and prejudice" standard for determining when a habeas petition is procedurally barred. See Covey, 72 S.W.3d at 210. The Missouri Supreme Court stated in Brown that "habeas corpus . . . provides the proper avenue for relief in those limited circumstances in which the petitioner asserts a claim that is of the type enumerated in Rule 24.035, but that is time-barred under that rule, if the petitioner can met the 'cause and prejudice' standard set out in State ex rel. Nixon v. Jaynes, [63 S.W.3d 210 (Mo. 2001) (en banc)]." 66 S.W.3d at 722. Therefore, a habeas petitioner, in Missouri, need not show actual innocence to receive habeas relief if he can satisfy the cause and prejudice standard. See Covey, 72 S.W.3d at 210 (citing Brown, 66 S.W.3d at 730). "The 'cause' of procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. To establish 'prejudice,' the petitioner must show that the error he asserts worked to his actual and substantial

disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 210-11.

Respondent argues that Petitioner's § 2254 Petition for habeas relief should be denied because Petitioner has procedurally defaulted all of the grounds upon which he seeks relief by not timely filing for transfer to the Missouri Supreme Court as required by O'Sullivan. As discussed above, the Eighth Circuit concluded, in Randolph, 276 F.3d at 405, that a state prisoner, seeking federal habeas review, need not seek transfer to the Missouri Supreme Court. The court finds, therefore, that Petitioner did not procedurally default his claims by failing to file for transfer to the Missouri Supreme Court.

Respondent further argues that Grounds 2 and 5 of Petitioner's § 2254 Petition are procedurally barred because Petitioner did not preserve these issues for appeal. The Missouri appellate court considered Petitioner's claims on direct appeal, although it did so pursuant to plain error review. In regard to Ground 2, the Missouri appellate court said that Petitioner "did not raise issues regarding Mock's testimony at trial or in his motion for a new trial; as a result, he has preserved nothing for review. In any event, we may review for plain error." Resp. Ex. 9 at 16. In regard to Ground 5, the Missouri appellate court said that "not being timely, the amendment preserves nothing for review, and procedurally, it is "a nullity." (citation omitted). However, under the plain error doctrine or as part of our inherent power, we have addressed an untimely request to consider newly discovered evidence." Id. at 20.

Authority within the Eighth Circuit is mixed in regard to whether a state prisoner can raise a claim pursuant to a § 2254 petition which has only been reviewed by the state court for plain error. The Eighth Circuit acknowledged in Hornbuckle v. Groose that "'[t]here appears to be a decisional split within our Circuit on whether plain-error review by a state appellate court waives a procedural

default by a habeas petitioner, allowing collateral review by this court.'" 106 F.3d 253, 257 (8th Cir. 1997) (quoting Mack v. Caspari, 92 F.3d 637, 641 n.6 (8th Cir. 1996)). In Hornbuckle, 106 F.3d at 257, the Eighth Circuit chose to follow cases holding that where Missouri courts review procedurally defaulted claims of a habeas petitioner for plain error, the federal habeas court may likewise review for plain error. More recently, in Thomas v. Bowersox, 208 F.3d 699, 701 (8th Cir. 2000), cert. denied, 531 U.S. 967 (2000), the Eighth Circuit addressed the merits of a habeas petitioner's claim where the state court had reviewed the claim for plain error. See also, James v. Bowersox, 187 F.3d 866, 869 (8th Cir. 1999), cert. denied, 528 U.S. 1143 (2000). Because the court finds, for the reasons stated below, that Petitioner's claims are without substantive merit, the court need not determine whether Petitioner's Ground 2 and Ground 5 are procedurally barred.

## IV.
## EFFECTIVE ASSISTANCE OF COUNSEL STANDARD

To prove ineffective assistance of counsel, a habeas petitioner must show that: "(1) his counsel so grievously erred as to not function as the counsel guaranteed by the Sixth Amendment; and (2) his counsel's deficient performance prejudiced his defense." Auman v. United States, 67 F.3d 157, 162 (8th Cir. 1995) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984) (Strickland)). The "performance" prong of Strickland requires a showing that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." See id. at 690. To overcome this presumption, a petitioner must prove that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. The court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances

of the counsel's challenged conduct, and to evaluate the conduct from the counsel's perspective at the time." Id. at 689.

Even if a petitioner satisfies the performance component of the analysis, he is not entitled to relief unless he can prove sufficient prejudice. Id. at 694. To do so, a petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. The court is not required to "address both components of the [effective assistance of counsel] inquiry if [a petitioner] makes an insufficient showing on one [component]." Strickland, 466 U.S. at 697.

## V.
## DISCUSSION

### A. Ground 1 - Admission of the Mask and Ground 4- Exclusion of Testimony:

Petitioner bases his Grounds 1 and 4 on evidentiary rulings of the trial court. In Ground 1, Petitioner alleges that the mask found in his car should have not been introduced into evidence. In Ground 4, Petitioner alleges that the trial court erred in excluding testimony of Nickerson regarding Petitioner's statement that he was not involved in the shooting.

As discussed above, Williams requires that upon consideration of a state prisoner's habeas petition a federal court must determine whether the relevant state court decisions are contrary to and reasonably interpret federal law as established by the United States Supreme Court. In Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), the Court held that:

> [I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241; Rose v. Hodges, 423 U.S. 19, 21 (1975) (per curiam).

The Court then turned to the issue of whether the admission of disputed evidence violated

22

the habeas petitioner's federal constitutional rights. In <u>Estelle</u>, the habeas petitioner had been charged with battering a child. The question before the Court was whether evidence of prior injury to the child was inadmissible. The Petitioner argued that the trial court deviated in part from a standard California jury instruction. In response, the Court said that "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." <u>See id.</u> at 71 (citing <u>Marshall v. Lonberger</u>, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules")). The Court concluded that it could not reverse the Petitioner's conviction based on a belief that the trial judge incorrectly interpreted the California Evidence Code in ruling on the admissibility of the prior injury. The Court held that "[t]he only question for us is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" <u>Id.</u> at 72 (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973)). In other words, the arguably objectionable instruction had to have violated some constitutional right. <u>See id.</u> Moreover, the Court noted that it has "'defined the category of infractions that violate "fundamental fairness" very narrowly.'" <u>Id.</u> (quoting <u>Dowling v. United States</u>, 493 U.S. 342, 352 (1990)). The United States Supreme Court concluded, in <u>Estelle</u>, 502 U.S. at 69-70, that the disputed evidence was probative on the question of intent and that the petitioner's due process rights were not violated by the admission of the evidence at trial.

The United States Supreme Court also held, in <u>Payne v. Tennessee</u>, 501 U.S. 808, 825 (1991) (citing <u>Darden v. Wainwright</u>, 477 U.S. 168, 170-80 (1986) (<u>Darden</u>)), that if evidence introduced at a criminal trial "is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." <u>Darden</u> provides that the "relevant question" is whether admission of the challenged evidence "so infected the trial

with unfairness as to make the resulting conviction a denial of due process." 477 U.S. at 181. See also Romano v. Oklahoma, 512 U.S. 1, 12 (1994) ("The relevant question in this case ... is whether the admission of evidence regarding petitioner's prior death sentence so infected the sentencing proceedings with unfairness as to render the jury's imposition of the death penalty a denial of due process.").

Additionally, the Eighth Circuit has stated that "in a § 2254 habeas corpus proceeding, a federal court's review of the alleged due process violations stemming from a state court conviction is narrow." Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir. 1995). To prevail, a state habeas petitioner must show that "absent the alleged impropriety, the verdict probably would have been different." Harris v. Bowersox, 184 F.3d 744, 752 (8th Cir. 1999). In reaching a determination regarding an alleged due process violation, a federal court "must review the totality of the facts in the case and the fairness of the whole trial." Id. An erroneous admission of challenged evidence may be rendered harmless by overwhelming evidence of a petitioner's guilty. See Hobbs v. Lockhart, 791 F.2d 125, 128 (8th Cir. 1986).

In regard to the admission of the mask in Petitioner's trial, the Missouri appellate court stated, in relevant part:

> [Petitioner] contends that the trial court erred in overruling his objection to the admission of the mask seized from his automobile ten weeks prior to the victim's murder and to the testimony of Bailey regarding the mask. [Petitioner] argues that the mask was not probative of any material issue in the case and was highly prejudicial as demonstrative evidence. Further, [Petitioner] argues that the mask was collateral and showed only that [Petitioner] had been involved in another crime. ...
>
> Whether evidence is relevant and its probative value outweighs its potential dangers are questions for the trial court to decide. State v. Silvey, 894 S.W.2d 662, 669 (Mo. banc 1995). Further, demonstrative evidence tending to establish any fact in issue or shed light on the controversy and aid the jury in any way in arriving at the correct verdict is admissible. Id. The trial judge occupies a superior vantage point

for balancing the probative value and prejudicial effect of demonstrative evidence. Id. Thus, the trial judge is necessarily vested with broad discretion in admitting or rejecting such evidence and we will not interfere with such ruling in the absence of a clear abuse of that discretion. Id.

Here, the use of the mask as a demonstrative exhibit was probative of a material issue. Elking initially testified that the masks worn by the shooters exposed the eyes from the nose to the forehead. Elking testified that upon being ordered to "get the f--k up," he noticed that [Petitioner's] "one eye was kind of lazy and he was staring at me," and that the mask taken from [Petitioner's] automobile was the same type of mask worn by the shooters. On cross-examination, [Petitioner] put Elking's identification of him at issue by raising doubts about Elking's credibility because he failed to correctly identify [Petitioner] during the first line-up and, due to the mask, could not see [Petitioner's] entire face. The State refuted this argument by presenting Elking's testimony on redirect, wherein, he stated that he recognized [Petitioner] due to his height, build, and lazy eye. Thus, the introduction of the mask, which was similar to the mask worn by the shooters, aided the jury in weighing Elking's identification testimony. Further, its probative value outweighed any prejudice it may have engendered. Point denied.

Resp. Ex. 9 at 14-15.

Petitioner makes the same argument to this court which he made before the Missouri appellate court regarding the mask.

The undersigned first notes that it is undisputed that Petitioner gave the officers permission to search his car; that the mask was found in his car; and that Elking identified the mask as being similar to those worn by the shooters. Moreover, there was substantial evidence of Petitioner's guilt, which evidence is described in detail above, and which evidence included the testimony of two eye witnesses. Therefore, even assuming, arguendo, that the mask was improperly admitted into evidence, this evidence did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 170 U.S. at 181.

The undersigned finds that the Missouri appellate court's determination that the mask seized from Petitioner's car was properly admitted into evidence is not contrary to United States Supreme

25

Court precedent as discussed above and that it is a reasonable interpretation of federal law. The court, therefore, finds that Petitioner's Ground 1 is without merit.

In regard to the trial court's exclusion of Nickerson's testimony, the Missouri appellate court held:

> [Petitioner] claims that the trial court erred in sustaining the State's objection to the admission of [Petitioner's] statement to Nickerson that he was not involved in the shooting of the victim and that he was with his girlfriend at the time of the shooting. [Petitioner] argues that the admission of his incriminating statement to Detective Campbell, rendered his exculpatory statement to Nickerson admissible pursuant to the rule of completeness and that he was prejudiced by its omission. The State responds that [Petitioner's] statement to Nickerson was inadmissable hearsay in that it was a self-serving declaration offered to prove the truth of the matter asserted and that the rule of completeness does not apply to [Petitioner's] statement because it was not part of a confession used by the State.
>
> The rule of completeness seeks to ensure that a statement is not admitted out of context. State v. Skillicorn, 944 S.W.2d 877 (Mo. banc 1997). The rule is violated only when admission of the statement in an edited form distorts the meaning of the statement or excludes information that is substantially exculpatory to the declarant. Id.
>
> [Petitioner's] exculpatory statement, "Man, that boy was my friend, I didn't shoot him, I was with my girlfriend on Lafayette when that happened," was made to Nickerson on November 3, 1994, at approximately 6:15 p.m. Sometime after 8:00 p.m., Detective Campbell conducted another interview with [Petitioner] on an unrelated case and refrained from asking any questions regarding the murder of victim, whereupon, [Petitioner] made several spontaneous statements, including the following: "[W]hy did I let the white guy live?" and "[W]e're f----d because we let the white guy live." [Petitioner] argues that these statements took place "moments apart and represented one continuous and ongoing interrogation." However, the record reveals that [Petitioner's] statements were made approximately two hours apart, to different officers, and concerning different circumstances. Accordingly, the trial court did not violate the rule of completeness when it did not admit [Petitioner's] statement to Nickerson.

Resp. Ex. 9 at 19.

In reaching its conclusion regarding the admission of Nickerson's statement, the Missouri appellate court was applying Missouri evidentiary law. As stated above, the United States Supreme

26

Court holds that a "federal court may not reexamine a state court's interpretation and application of state law." Estelle, 502 U.S. at 62. Moreover, the "Due Process Clause does not permit the federal courts to engage in finely tuned review of the wisdom of state evidentiary rules." Id. at 72. Even assuming, arguendo, that the testimony of Nickerson was improperly excluded, the court finds that this exclusion did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 170 U.S. at 181.

The undersigned finds, therefore, that the Missouri appellate court's determination that Nickerson's testimony was properly excluded is not contrary to United States Supreme Court precedent and that it is a reasonable interpretation of federal law. Under such circumstances the court finds that Petitioner's Ground 4 is without merit.

## B.    Grounds 2 and 3 - Mocks testimony:

Petitioner alleges that he had ineffective assistance of counsel because his trial counsel failed to object to Mock's testimony and because the trial court failed to declare a mistrial sua sponte based on Mock's testimony. In regard to Mock's testimony, the Missouri appellate court stated:

> Defendants in criminal cases have a right to be tried only for the offense for which they are charged. State v. Hornbuckle, 769 S.W.2d 89, 96 (Mo. banc 1989). The rule is violated when evidence shows that the defendant has "committed, been accused of, been convicted of, or definitely associated with another crime or crimes." Id. "[V]ague references cannot be characterized as clear evidence associating [the defendant] with other crimes." Id.

> Here, the record indicates that upon Mock being called to testify, defense counsel moved to exclude his testimony. Outside the presence of the jury, defense counsel argued that Mock's testimony constituted "evidence of uncharged crimes." However, upon the State stipulating to defense counsel's motion, he withdrew his motion, stating, "Actually I may go into it." The trial court then concluded that defense counsel's motion would be disregarded. Mock proceeded to testify regarding an alleged second murder committed by [Petitioner]. Subsequently, Jackson testified and stated that there were no police records fitting the description of the second murder testified to by Mock. Under these circumstance, we find no manifest

27

injustice in the trial court's failure to declare a mistrial sua sponte.

Resp. Ex. 9 at 16-17.

Because Petitioner argues that the trial court should have sua sponte ordered a mistrial because of Mock's testimony, the court will first consider whether the trial court's action in regard to this evidentiary matter is consistent with the Supreme Court's decisions in Estelle and Darden, as discussed above. This court agrees with th Missouri appellate court's analysis that, as Jackson testified that there were no police records fitting the description of the second murder, the jury was made aware of possible ambiguities in Mock's testimony. Moreover, as discussed above, the jury was aware that Mock was in jail at the time he heard the incriminating conversations; that he was not promised anything in return for his testimony; that the prosecutor wrote a letter to the parole board at Mock's request; and that Mock had a seemingly valid reason for offering information regarding Boyd's murder. Even assuming, arguendo, that Mock's testimony was improper, it cannot be said that Mock's testimony so infected Petitioner's trial with unfairness so as to render the jury's decision a denial of due process nor can it be said there was manifest injustice by the trial court's failure to declare a mistrial. See Darden, 170 U.S. at 181. Moreover, upon considering the totality of the testimony at Petitioner's trial, Mock's allegedly objectionable testimony may be rendered harmless by other evidence of Petitioner's guilt as discussed in detail above. The court finds, therefore, that the Missouri appellate court's decision that the trial court did not err by failing to order a mistrial sua sponte as a result of Mock's testimony is not contrary to United States Supreme Court precedent and that the appellate court's decision is a reasonable interpretation of federal law. The court further finds that Petitioner's allegation in Ground 3 that the trial court erred by not ordering a mistrial, sua sponte, is without merit.

In regard to Petitioner's allegation that he was denied effective assistance of counsel in regard to his trial counsel's withdrawing his objection to Mock's testimony, the Missouri appellate court said:

> To prevail on an ineffective assistance of counsel claim, a movant must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. [State v. Williams, 861 S.W.2d 670, 675 (Mo. App. 1993)]. To prove deficient performance, a movant must show that his counsel's acts or omissions were outside the range of professionally competent assistance. Id. To do this movant must overcome the presumption that counsel's challenged acts or omissions were sound trial strategy. Id. To show prejudice, a movant must show that there was a reasonable probability that, but for the errors of the attorney, the jury would have had reasonable doubt respecting guilt. Id. If a movant makes an insufficient showing on either the deficient performance component or the prejudice component, the court need not address the other component. Id.

Resp. Ex. 9 at 17.

The Missouri appellate court then considered the explanation which Petitioner's trial counsel gave for his decision regarding Mock's testimony and counsel's testimony that he made a strategic decision to rely on impeachment of Mock's testimony and the "fact that it was absurd." The appellate court said, therefore, that "it is apparent from the record that, instead of attempting to exclude Mock and his testimony from any consideration by the jury, counsel chose to use Mock's testimony as a basis for arguing that there were weaknesses in the State's case. As such, the decision was a choice of trial strategy which does not provide grounds for a finding of ineffective assistance of counsel." Resp. Ex. 9 at 18.

The United States Supreme Court stated in Strickland, 466 U.S. at 688-89, that:

> [P]resenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in the American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily

take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. (citation omitted). ...

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. (citation omitted). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." (citation omitted). There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. (citation omitted).

This court finds that the Missouri appellate court's analysis of the performance of Petitioner's attorney in regard to his decision not to challenge Mock's testimony, its conclusion that the attorney's decision was one of trial strategy, and its conclusion that Petitioner did not receive ineffective assistance of counsel in this regard is not contrary to the standard applied by the United States Supreme Court in Strickland. and that it is a reasonable interpretation of federal law.

Additionally, for the reasons stated above in regard to the trial court's failure to order a mistrial sua sponte the court finds that Petitioner was not prejudiced by counsel's alleged ineffectiveness. The court, therefore, finds that Petitioner's allegation in Ground 2 that he received ineffective assistance of counsel is without merit.

## C. Ground 5 - Trial Court Error in Not Granting Petitioner a New Trial:

Petitioner alleges that the trial court erred in not granting Petitioner a new trial or an

evidentiary hearing on his motion for a new trial which motion was based on newly discovered

evidence in the form of letters from Petitioner's co-defendant, Phillip Campbell. Petitioner argued

before the Missouri appellate court, and now argues before this court, that he presented the above

described letters from Phillip Campbell after his conviction but prior to Phillip Campbell's plea to

a lesser charge and that in these letters Phillip Campbell admits that someone other than Petitioner

shot Boyd. Petitioner further argues, as he did before the appellate court, that he would have

presented Phillip Campbell's testimony at an evidentiary hearing and that the letters are newly

discovered evidence of Petitioner's innocence.

In regard to the claim made in Petitioner's Ground 5, the Missouri appellate court stated:

> Rule 29.11(b) grants a defendant in a criminal case the right to file [a] motion for a new trial "within fifteen days after the return of the verdict." The trial court may extend this time "for an additional period not to exceed ten days." Id. Here, the verdict was rendered on July 12, 1995. [Petitioner] filed his initial motion for a new trial on August 4, 1995, within the time granted by the Rule and the trial court. However, in that motion, [Petitioner] did not mention any letters, but only that evidence consisting of the testimony of Phillip Campbell that he and another, not [Petitioner] shot the victim. [Petitioner] alleged that such evidence would be produced through his own testimony and Phillip Campbell's testimony. [Petitioner] did not file the letters until his motions for new trial and evidentiary hearing were denied on September 29, 1995, clearly outside the time allotted for a motion for a new trial. At best, this request is an attempt to amend his motion for a new trial. Even as an amendment, however, his request for a new trial based on newly discovered evidence consisting of the letters from Phillip Campbell cannot avoid the strictures of Rule 29.11(b). State v. Hamilton, 732 S.W.2d 553, 555 (Mo. App. E.D. 1987). Not being timely, the amendment preserves nothing for review, and procedurally, it is "a nullity." Id. However, under the plain error doctrine or as part of our inherent power, we have addressed an untimely request to consider newly discovered evidence. Id. Accordingly, we will consider [Petitioner's] point.
>
> To be entitled to a new trial on the basis of newly discovered evidence, [Petitioner] must demonstrate that: (1) the facts constituting the newly discovered evidence have come to the movant's knowledge after the end of the trial; (2) movant's lack of prior knowledge is not owing to any want of due diligence on his part; (3) the evidence is so material that it is likely to produce a different result at a new trial; and (4) the evidence is neither cumulative nor merely of an impeaching

nature.  State v. Davis, 698 S.W.2d 600, 602 (Mo. App. E.D. 1985).  It is [Petitioner's] burden to show that the above requirements have been met.  Hamilton, 732 S.W.2d at 556.

Resp. Ex. 9 at 20-21.

The Missouri appellate court found that Petitioner did not meet the first requirement of Davis that the facts constituting the newly discovered evidence came to the Petitioner's attention after the end of the trial.  In reaching this conclusion, the appellate court considered that in Phillip Campbell's affidavit accompanying Petitioner's second motion for a new trial, he stated that he wrote Petitioner a letter after his conviction "explaining what happened, and attempting to sympathize for the wrongful situation [he] had gotten [Petitioner] into," and that Petitioner responded with a letter "demanding that [Phillip Campbell] come forward or he was going to give the letter [Phillip Campbell] sent him to his attorney."  The appellate court further noted, however, that the affidavit does "not state when either letter was written, nor does it refer to the four undated letters filed by [Petitioner]."  Resp. Ex. 9 at 21.  The appellate court concluded, therefore, that Petitioner had not met the first requirement of Davis and that there was no manifest injustice or miscarriage of justice in the trial court's decision.  See id.

The undersigned first notes that there is no federal constitutional right to a  new trial based solely on newly discovered evidence.  In Herrera v. Collins, 506 U.S. 390, 400 (1993), the United States Supreme Court addressed the issue of whether a claim of innocence based on newly discovered evidence is a basis for federal habeas relief.  The court held that such a claim has "never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  Id.  The Court, in Herrera, held that "'the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground

32

for relief on a federal habeas corpus.'" 506 U.S. at 400 (quoting <u>Townsend v. Sain</u>, 372 U.S. 317(1963)) . The Court further held, in <u>Herrera,</u> that "[t]his rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - - not to correct errors of fact." 506 U.S. at 400. Additionally, the Court held that "'[f]ederal courts are not forums in which to relitigate state trials.'" <u>Id.</u> (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 887 (1983)).

Additionally, in <u>Meadows v. Delo</u>, the Eighth Circuit held that "the test for newly discovered evidence is 'whether the evidence could have been discovered earlier in the exercise of due diligence.'" 99 F.3d 280, 282 (8th Cir. 1996) (quoting <u>Cornell v. Nix</u>, 976 F.2d 376, 380 (8th Cir. 1992)). In <u>Meadows</u>, the Eighth Circuit was considering whether the affidavit of a co-defendant was new evidence and concluded that it was not. The court noted that "[a]lthough the affidavit itself was not available until after [the petitioner's] trial, the factual basis for it existed long before [the petitioner's] appeal." <u>Id.</u> The court further noted that it has held that "when a defendant who has chosen not to testify subsequently comes forward to offer testimony exculpating a codefendant, the evidence is not 'newly discovered.'" <u>Id.</u> (quoting <u>United States v. Rogers</u>, 982 F.2d 1241, 1245 (8th Cir. 1993) (quoting <u>United States v. Offutt</u>, 736 F.2d 1199, 1201 (8th Cir. 1984)).

In agreement with the Missouri appellate court, the undersigned finds that there is no indication when the letters from Phillip Campbell were written. Most significantly, the parties agreed that at the time Petitioner asked for a new trial based on the letters, Phillip Campbell would not have agreed to testify and, thus, it is not likely that the allegedly newly discovered evidence would have resulted in a different verdict. Moreover, as discussed above, Petitioner was convicted of the murder of Boyd upon the testimony of two eye witnesses, as well as the testimony of several

police officers, forensic experts, and Mock.  Under such circumstances it cannot be said that the trial court's refusal to grant Petitioner a new trial based on Phillip Campbell's letters resulted in a miscarriage of justice or in manifest injustice.  The undersigned further finds that the reasoning of the Missouri appellate court is not contrary to United States Supreme Court precedent and that it is a reasonable interpretation of federal law.  The court finds, therefore, that Petitioner's Ground 5 is without merit.

## VI.
## CONCLUSION

For the reasons stated above, the court finds that Grounds 1-5, as raised by Petitioner in his petition for habeas corpus relief, are without merit.   As such, Petitioner's § 2254 petition for habeas relief should be denied in its entirety.  The undersigned further finds that the grounds asserted by Petitioner do not give rise to a any issues of constitutional magnitude.  Because Petitioner has made no showing of a denial of a constitutional right, Petitioner should  not be granted a certificate of appealability in this matter.  See Tiedeman v Benson, 122 F.3d 518, 522 (8th Cir. 1997).


Accordingly,


**IT IS HEREBY RECOMMENDED** that the Petition filed by Petitioner for habeas corpus pursuant to 28 U.S.C. § 2254 be **DENIED**; [4]


**IT IS FURTHER RECOMMENDED** that for the reasons stated herein, any motion by Petitioner for a certificate of appealability should be **DENIED**.

The parties are advised that Petitioner has eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.3d 356 (8th Cir. 1990).

MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 22 day of January, 2003.

AN ORDER, JUDGMENT OR ENDORSEMENT WAS SCANNED, FAXED AND/OR MAILED TO THE
FOLLOWING INDIVIDUALS ON 01/23/03 by lholwitt
                    4:00cv408     Johnson vs Luebbers

28:2254 Petition for Writ of Habeas Corpus (State)

Lamar Johnson -
#516846
Potosi Correctional Ctr.
PCC
P.O. Box 2222, R.R. 2
Mineral Point, MO  63660

James McAdams -                    Fax: 573-751-9456

SCANNED & FAXED BY

JAN 23 2003

SA